1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  SHAWN A. WILLIAMS (213113)
    100 Pine Street, Suite 2600
3  San Francisco, CA 94111
    Telephone: 415/288-4545
4  415/288-4534 (fax)
    swilliams@csgrr.com
5        – and –
    DARREN J. ROBBINS (168593)
6  DAVID C. WALTON (167268)
    CATHERINE J. KOWALEWSKI (216665)
7  655 West Broadway, Suite 1900
    San Diego, CA 92101
8  Telephone: 619/231-1058
    619/231-7423 (fax)
9  darrenr@csgrr.com
    davew@csgrr.com
10 katek@csgrr.com

11 Attorneys for Plaintiff

12                    UNITED STATES DISTRICT COURT

13                 NORTHERN DISTRICT OF CALIFORNIA

14                                          )
    ELLEN BRODSKY, Individually and On      )  Case No. C 07 5141
15 Behalf of All Others Similarly Situated, )
                                            )  CLASS ACTION
16                        Plaintiff,        )
                                            )  COMPLAINT FOR VIOLATION OF THE
17         vs.                              )  FEDERAL SECURITIES LAWS
                                            )
18 BIGBAND NETWORKS, INC., AMIR             )
    BASSAN-ESKENAZI, FREDERICK A.           )
19 BALL, LLOYD CARNEY, DEAN GILBERT,        )
    KENNETH A. GOLDMAN, GAL ISRAELY,        )
20 RAN OZ, BRUCE I. SACHS, ROBERT J.        )
    SACHS, GEOFFREY Y. YANG, MORGAN         )
21 STANLEY & CO. INCORPORATED,              )
    JEFFERIES & COMPANY, INC., MERRILL      )
22 LYNCH, PIERCE, FENNER & SMITH            )
    INCORPORATED, COWEN AND                 )
23 COMPANY, LLC and THINKEQUITY             )
    PARTNERS LLC,                           )
24                                          )
                          Defendants.       )
25 _____ )  DEMAND FOR JURY TRIAL

26

27

28

MHP

1    NATURE OF THE ACTION

2    1.    This is a class action on behalf of all persons or entities who acquired the common

3   stock of BigBand Networks, Inc. ("BigBand" or the "Company") pursuant and/or traceable to the

4   Company's false and misleading Registration Statement and Prospectus (collectively, the

5   "Registration Statement") issued in connection with its March 14, 2007 initial public offering

6   ("IPO"), seeking to pursue remedies under the Securities Act of 1933 ("1933 Act").

7    2.    BigBand develops, markets and sells network-based platforms that enable cable

8   operators and telephone companies to offer video, voice and data services across coaxial, fiber and

9   copper networks. BigBand has implemented de facto network architecture for digital simulcast, an

10  application that facilitates the insertion of advertising and the transmission of video in a digital

11  format across a network while still providing service to analog subscribers.

12   3.    On March 20, 2007, BigBand closed its IPO of 12.3 million shares at $13.00 per

13  share (7.5 million shares sold by BigBand and 4.8 million shares sold by certain selling shareholders,

14  including 1.6 million shares sold as part of an over-allotment) for net proceeds of $148.8 million,

15  pursuant to the Registration Statement. The Registration Statement failed to disclose that BigBand

16  was having difficulty integrating and customizing its switched digital video ("SDV") technology,

17  that BigBand's past results were not indicative of its future operations and that the viability of the

18  Company's cable modem termination system ("CMTS") business was in doubt.

19   4.    Due to defendants' positive, but false statements, BigBand's stock closed as high as

20  $21.43 per share on May 3, 2007.

21   5.    On August 2, 2007, BigBand issued a press release announcing its 2Q 2007 results,

22  stating in part:

23        BigBand Networks, Inc., a leading provider of broadband multimedia
          infrastructure for video, voice and data, today announced financial results for the
24        three and six months ended June 30, 2007.

25        For the second quarter of 2007, BigBand Networks reported net revenues of
          $54.5 million, an increase of 43% over the second quarter of 2006. GAAP net
26        income for the quarter was $1.7 million, or $0.02 per diluted share, compared to a net
          loss of $0.6 million, or ($0.05) per share reported in the second quarter of 2006.
27        Gross margin improved to 53.4% on a GAAP basis from a gross margin of 48.7% in
          the second quarter of 2006. Operating income increased to $42,000 on a GAAP basis
28        during the second quarter of 2007 from an operating loss of $0.4 million in the

second quarter of 2006. GAAP results for the second quarter of 2007 includes $2.9 million in stock-based compensation expense and $0.1 million in amortization of intangibles. In the second quarter of 2006, we incurred $0.5 million in stock-based compensation expense, $0.1 million in amortization of intangibles and $57,000 in preferred stock warrant expense. A reconciliation of our GAAP and non-GAAP results is included as part of this release.

Excluding the above-mentioned charges, net of tax, non-GAAP results for the second quarter of 2007 includes net income of $4.7 million, or $0.07 per diluted share, compared to a net loss of $22,000, or $0.00 per diluted share, reported in the second quarter of 2006. Gross margin improved to 54.2% during the second quarter of 2007 from 48.9% in the second quarter of 2006. Operating income increased to $3.1 million during the second quarter of 2007 from $0.3 million in the second quarter of 2006.

"We are pleased with our improvements in both revenues and earnings results in the second quarter," commented Amir Bassan-Eskenazi, president and CEO of BigBand Networks. "We continued to drive significant expansion of the footprint of our media services platforms. We continue to work closely with customers in supporting their efforts to enhance their existing networks for advanced video services. We believe that BigBand's solutions for switched broadcast and TelcoTV will continue to gain traction with major customers both in the U.S. and internationally.

For the first six months of 2007, BigBand Networks reported net revenues of $107.3 million, an increase of 52% over the first half of 2006. GAAP results for the six months period of 2007 includes net income of $0.7 million, or $0.01 per diluted share, compared to a net loss of $1.6 million, or ($0.15) per diluted share reported in the six months period of 2006. Gross margin improved to 55.4% in the first half of 2007 from 49.8% in the first half of 2006. Operating income increased to $3.4 million during the first half of 2007 from an operating loss of $1.5 million in the first half of 2006. GAAP net income for the first half of 2007 includes non-cash charges of $5.0 million in preferred stock warrant expense, $5.4 million in stock-based compensation expense, and $0.3 million in amortization of intangibles. This compares to non-cash charges of $0.2 million in preferred stock warrant expense, $0.8 million in stock-based compensation expense and $0.3 million in amortization of intangibles for the first half of 2006.

Excluding the above-mentioned charges, net of tax, non-GAAP results include net income for the first half of 2007 of $10.5 million, or $0.16 per diluted share. This compares to a net loss of $0.7 million, or ($0.06) per diluted share, reported in the first half of 2006. Gross margin improved to 56.1% during the first half of 2007 from a gross margin of 50.0% in the first half of 2006. Operating income increased to $9.0 million during the first half of 2007 from an operating loss of $0.4 million in the first half of 2006.

"Video continues to be a major driver of capital expenditures in service provider networks. We believe that our technology innovation and time-to-market leadership are key competitive differentiators in our video and data markets. Our product roadmap calls for more innovation as the industry moves to addressable advertising and personalized video services. We continue to be well-positioned for additional growth over the long-term and are optimistic about our business," concluded Bassan-Eskenazi.

Business Outlook

Based on current expectations, management provided the following outlook for its business in the third quarter of 2007:

**Quarter Ending September 30, 2007**

- Net revenues are anticipated to be in the range of approximately $54 to $58 million.

- GAAP gross margins are anticipated to be in the range of 53% to 55%, which includes approximately $0.4 million in stock-based compensation.

- GAAP operating expenses are anticipated to be in the range of $30 to $31 million, which includes approximately $3.0 million in stock-based compensation and amortization of intangibles.

- Provision for income tax is anticipated to be in the range of approximately $0.5 to $0.6 million.

- Fully diluted weighted average shares are anticipated to be in the range of 71 to 72 million shares.

- This equates to GAAP earnings (loss) per share in the range of ($0.01) to $0.03, and a non-GAAP earnings per share in the range of $0.03 to $0.07.

**Fiscal Year Ending December 31, 2007**

- Net revenues are anticipated to be in the range of approximately $225 to $230 million.

- GAAP gross margins are anticipated to be in the range of 54% to 56%, which includes approximately $1.5 million in stock-based compensation.

- GAAP operating expenses are anticipated to be in the range of $116 to $121 million, which includes stock-based compensation of approximately $10.5 million and amortization of intangibles of $0.6 million.

- Provision for income tax is anticipated to be in the range of approximately $2.0 to $2.5 million.

- Fully diluted weighted average shares are anticipated to be in the range of 69 to 70 million shares.

- This equates to GAAP earnings per share in the range of $0.03 to $0.08, and a non-GAAP earnings per share in the range of $0.28 to $0.33.

1    6.    On this news, BigBand's stock price collapsed from $13.98 per share on August 2,

2  2007 to close at $10.10 per share on August 3, 2007 – a one day decline of $3.88 per share or 28%.

3    7.    After the disappointing second quarter results, the market began to question the price

4  and timing of the IPO. On September 9, 2007, *Globes [online]* interviewed Bassan-Eskenezi:

5        [*GLOBES*:]    Which brings us back to the IPO. Perhaps you really did float
      too soon, and the company wasn't mature enough yet for this?

6

7        [BASSAN-ESKENEZI:]    The flotation was part of the process of building
      the company. The networked video transmission field is likely to be even larger than
      it is today. It was important to our customers that we also continue to establish the

8        company as a public one with $150 million in the bank. New video technology
      companies are now leading this field, and veterans like Cisco weren't able to hold on

9        to this market. Juniper was the one that made the big break with the advent of
      Internet transmission over service supplier platforms; IBM was already there when

10       the PC was the big issue, but Intel and Microsoft also entered. We believe that we
      have the ability to build a company on a scale that will make it the leader of the

11       entire networked video transmission industry.

12       [*GLOBES*:]    Are you referring here to the scale of Juniper and Microsoft?
      You've got big ambitions.

13

14       [BASSAN-ESKENEZI:]    Not Microsoft or Intel, because this is not a
      consumer's market, but look at how Juniper built the networking field. I think that
      our solution is radically different from that of the other companies, in the same

15       fashion as Juniper differed in its approach to the networks market to Cisco and
      3Com.

16

17       [*GLOBES*:]    Perhaps the IPO price of $13 per share was too high.

18       [BASSAN-ESKENEZI:]    We set a price that we believed showed where
      the company stands. We believe that in terms of potential, the company represents
      the price that we set as a result of the feedback we received during the road show.

19       Without commenting on the price today, or tomorrow, the company is in a growing
      market, and our market share justifies the share price. This is something that should

20       be assessed over time.

21    8.    Then on September 27, 2007, after the market closed, BigBand issued a press release

22  revising its 3Q 2007 results. The press release stated in part:

23       BigBand Networks, Inc., today revised its revenue outlook for the third quarter
      ending September 30, 2007. The Company now expects to report revenue for the

24       third quarter in the range of $35 to $39 million, which is below the Company's
      previous guidance of $54 to $58 million.

25

26       The lower revenue outlook is due to several coincident factors. BigBand has
      been deploying switched digital video across an expanding number of customers and
      configurations. Some of these ongoing deployments have required more software

27       customization and integration than originally expected. This impacted the
      Company's ability to recognize switched digital revenue for some deployments in the

28       third quarter. The Company also experienced slowdown in Telco-TV revenue, as its

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 4 -

major customer worked through some previously purchased inventory. Finally, the Company experienced continued softness in its data business. As a result of lower revenue expectations, BigBand expects to report an operating loss for the third quarter of fiscal year 2007.

"While we believe the market for our video solutions continues to be strong and are confident in our roadmap for the long term, we are clearly disappointed in our execution this quarter." said Amir Bassan-Eskenazi, BigBand's chief executive officer. "We are aggressively addressing these issues and will provide more specifics in our announcement of third quarter financial results in early November."

9.    On this news, BigBand's stock price collapsed from $9.07 per share on September 27, 2007 to close at $6.40 per share on September 28, 2007 – a one day decline of $2.67 per share or 29% on volume of 6.8 million shares – over 10 times the average previous trading volume for the stock. Prior to the August disclosure, the Company's stock traded between $12.49 and $21.43 per share with an average trading price of $16.70 per share.

10.    The true facts which were omitted from the Registration Statement were as follows:

(a)    Due to difficulties in integrating and customizing its SDV technology, BigBand would have to defer the recognition of revenue associated with its SDV product sales over a longer period of time;

(b)    Customers were having interoperability issues with BigBand's SDV technology due to integration problems with the software when used in connection with the Motorola platform;

(c)    The Company's past results were not indicative of its future operations, including revenue derived from its TelcoTV product sales, as large customers such as Verizon had accumulated excessive amounts of inventory which would not be an ongoing occurrence; and

(d)    The viability of the Company's CMTS business was in doubt due to the Company's inability to compete against the dominant players in the market – Arris, Cisco Systems and Motorola. The Company's main competitors were larger, more established, better capitalized and offered full end-to end solutions, which enabled to them to engaged in aggressive pricing to the detriment of BigBand.

JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§11 and 15 of the 1933 Act [15 U.S.C. §§77k and 77o].

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because the defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

PARTIES

15.     Plaintiff Ellen Brodsky acquired the common stock of BigBand pursuant or traceable to the IPO, as set forth in the accompanying certification, and has been damaged thereby.

16.     Defendant BigBand is headquartered in Redwood City, California. Its stock trades in an efficient market on the NASDAQ.

17.     Defendant Amir Bassan-Eskenazi ("Bassan-Eskenazi") is co-founder of BigBand. Bassan-Eskenazi is Chairman of the Board of Directors, President and Chief Executive Officer ("CEO") of the Company.  Bassan-Eskenazi signed or authorized the signing of the false and misleading Registration Statement.

18.     Defendant Frederick A. Ball ("Ball") is Senior Vice President and Chief Financial Officer ("CFO") of BigBand.  Ball signed or authorized the signing of the false and misleading Registration Statement.

19.     Defendant Ran Oz ("Oz") is co-founder of BigBand. Oz is Executive Vice President and Chief Technology Officer of the Company, and has served as a director since May 2005. Oz signed the false and misleading Registration Statement.

20.     Defendant Lloyd Carney ("Carney") is a director of BigBand. Carney signed or authorized the signing of the false and misleading Registration Statement.

1    21.    Defendant Dean Gilbert ("Gilbert") is a director of BigBand.  Gilbert signed or
2  authorized the signing of the false and misleading Registration Statement.

3    22.    Defendant Kenneth A. Goldman ("Goldman") is a director of BigBand.  Goldman
4  signed or authorized the signing of the false and misleading Registration Statement.

5    23.    Defendant Gal Israely ("Israely) is a director BigBand.  Israely is a founder of Cedar
6  advisors, a provider of investment and financial advice for high technology companies, as well as an
7  advisor to the venture capital firm Cedar Funds.  Immediately after the IPO, funds affiliated with
8  Cedar Funds beneficially owned 4.4% of the outstanding shares of the Company.  Israely is a
9  managing partner of these funds. Israely signed or authorized the signing of the false and misleading
10  Registration Statement.

11    24.    Defendant Bruce I. Sachs ("B. Sachs") is a director of BigBand. B. Sachs is a partner
12  at Charles River Ventures, which focuses communications infrastructure investments. Immediately
13  after the IPO, funds affiliated with Charles River Ventures beneficially owned 19% of the
14  outstanding shares of the Company, making them the second largest shareholder of the Company.
15  B. Sachs signed or authorized the signing of the false and misleading Registration Statement.

16    25.    Defendant Robert J. Sachs ("R. Sachs") is a director of BigBand. R. Sachs signed or
17  authorized the signing of the false and misleading Registration Statement.

18    26.    Defendant Geoffrey Y. Yang ("Yang") is a director of BigBand. Yang is a founding
19  partner of Redpoint Ventures. Immediately after the IPO, funds affiliated with Repoint Ventures
20  beneficially owned 22.5% of the outstanding shares of the Company, making them the largest
21  shareholder of the Company. Yang signed or authorized the signing of the false and misleading
22  Registration Statement.

23    27.    The defendants referenced above in ¶¶17-26 are referred to herein as the "Individual
24  Defendants."

25    28.    Certain of the Individual Defendants also sold shares of their BigBand stock at $13.00
26  per share in the IPO as follows:

27

28

| DEFENDANT | SHARES SOLD[1] | GROSS PROCEEDS |
|---|---|---|
| BASSAN-ESKENAZI | 400,058 | $5,200,754 |
| OZ | 400,000 | $5,200,000 |
| GILBERT | 20,109 | $261,417 |
| ISRAELY | 446,229 | $5,800,977 |
| TOTAL | 1,266,396 | $16,463,148 |

29.    Additionally, certain family members of the Individual Defendants also sold shares of their BigBand stock at $13 per share in the IPO as follows:

| DEFENDANT | SHARES SOLD | GROSS PROCEEDS |
|---|---|---|
| ROBERT CLARK FOWLER JR.[2] | 2,783 | $36,179 |
| STEPHANIE JEAN FOWLER[3] | 2,217 | $28,821 |
| HAIM BASSAN-ESKENAZI[4] | 375 | $4,875 |
| RUTH BASSAN-ESKENAZI[5] | 375 | $4,875 |
| SARIT YAFFE[6] | 625 | $8,125 |
| NIR YAFFE[7] | 625 | $8,125 |
| DROR AMIR[8] | 603 | $7,839 |
| TOTAL | 7,603 | $98,839 |

30.    Defendant Morgan Stanley & Co. Incorporated ("Morgan Stanley") is a global financial services firm that, through its subsidiaries and affiliates, provides its products and services to customers, including corporations, governments, financial institutions and individuals. Morgan Stanley assists public and private corporations in raising funds in the capital markets (both equity and debt), as well as in providing strategic advisory services for mergers, acquisitions and other types of financial transactions. Morgan Stanley acted as an underwriter in the sale of corporate

[1]    Including shares sold as part of over-allotment

[2]    Bassan-Eskenzai's brother-in-law.

[3]    Bassan-Eskenzai's sister-in-law.

[4]    Bassan-Eskenzai's father.

[5]    Bassan-Eskenzai's mother.

[6]    Bassan-Eskenzai'sister.

[7]    Bassan-Eskenzai's brother-in-law.

[8]    Oz's cousin.

1 || securities and acted as financial advisor to BigBand in connection with the IPO, helping to draft and
2 || disseminate the offering documents.

3      31.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch")
4 || provides capital markets services, investment banking and advisory services, wealth management,
5 || asset management, insurance, banking and related products and services on a global basis. Merrill
6 || Lynch acted as financial advisor to BigBand in connection with the IPO, helping to draft and
7 || disseminate the offering documents.

8      32.     Defendant Jefferies & Company, Inc. ("Jefferies") is a full-service global investment
9 || bank and institutional securities firm focused on growing and middle-market companies and their
10 || investors.    Jefferies provides clients with capital markets and financial advisory services,
11 || institutional brokerage, securities research and asset management. Jefferies acts as an underwriter in
12 || the sale of corporate securities, and acted as a financial advisor to BigBand in connection with the
13 || IPO, helping to draft and disseminate the offering documents.

14      33.     Defendant Cowen and Company, LLC ("Cowen") offers research, trading and
15 || investment banking services focused on the needs of growing companies, providing advice and
16 || execution of creative and high-profile transactions across a broad range of sectors. Cowen acted as
17 || and underwriter and financial advisor to BigBand in connection with the IPO, helping to draft and
18 || disseminate the offering documents.

19      34.     Defendant ThinkEquity Partners LLC ("ThinkEquity") is a research-centric
20 || institutional investment firm focused on growth sectors of the economy. ThinkEquity acted as an
21 || underwriter and financial advisor to BigBand in connection with the IPO, helping to draft and
22 || disseminate the offering documents.

23                        CLASS ACTION ALLEGATIONS

24      35.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil
25 || Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who acquired
26 || shares of BigBand common stock pursuant and/or traceable to the Company's false and misleading
27 || Registration Statement for its IPO and who were damaged thereby (the "Class"). Excluded from the
28 || Class are defendants, the officers and directors of the Company, at all relevant times, members of

1 || their immediate families and their legal representatives, heirs, successors or assigns and any entity in

2 || which defendants have or had a controlling interest.

3    36.    The members of the Class are so numerous that joinder of all members is

4 || impracticable. BigBand stock was actively traded on the NASDAQ. While the exact number of

5 || Class members is unknown to plaintiff at this time and can only be ascertained through appropriate

6 || discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record

7 || owners and other members of the Class may be identified from records maintained by BigBand or its

8 || transfer agent and may be notified of the pendency of this action by mail, using the form of notice

9 || similar to that customarily used in securities class actions. BigBand has more than 58.7 million

10 || shares of stock outstanding.

11    37.    Plaintiff's claims are typical of the claims of the members of the Class as all members

12 || of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

13 || complained of herein.

14    38.    Plaintiff will fairly and adequately protect the interests of the members of the Class

15 || and has retained counsel competent and experienced in class and securities litigation.

16    39.    Common questions of law and fact exist as to all members of the Class and

17 || predominate over any questions solely affecting individual members of the Class. Among the

18 || questions of law and fact common to the Class are:

19        (a)    whether the 1933 Act was violated by defendants' acts as alleged herein;

20        (b)    whether statements made by defendants to the investing public in the

21 || Registration Statement misrepresented material facts about the business, operations and management

22 || of BigBand; and

23        (c)    to what extent the members of the Class have sustained damages and the

24 || proper measure of damages.

25    40.    A class action is superior to all other available methods for the fair and efficient

26 || adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

27 || damages suffered by individual Class members may be relatively small, the expense and burden of

28

1  individual litigation make it impossible for members of the Class to individually redress the wrongs

2  done to them.  There will be no difficulty in the management of this action as a class action.

3                                   BACKGROUND

4       41.     BigBand develops, markets and sells network-based platforms that enable cable

5  operators and telephone companies to offer video, voice and data services across coaxial, fiber and

6  copper networks. BigBand has implemented de facto network architecture for digital simulcast, an

7  application that facilitates the insertion of advertising and the transmission of video in a digital

8  format across a network while still providing service to analog subscribers. The Company's product

9  applications of Digital Simulcast, TelcoTV, Switched Broadcast, and High-Speed Data and Voice-

10 over-IP are a combination of the Company's modular software and programmable video and data

11 hardware platforms.  BigBand's software and hardware product applications are used by service

12 providers worldwide to offer video, voice and data services to subscribers round the clock.

13                  THE FALSE AND DEFECTIVE REGISTRATION
                    STATEMENT AND PROSPECTUS
14
        42.     On or about March 8, 2007, BigBand filed with the SEC a Form S-1/A (the "IPO
15
   Registration Statement") for the IPO.
16
        43.     On or about March 15, 2007, BigBand filed its Prospectus for the IPO (the "IPO
17
   Prospectus"), which forms part of the IPO Registration Statement and which became effective on
18
   March 14, 2007, and at least 12.3 million shares of BigBand stock were sold to the public at $13.00
19
   per share (7.5 million shares sold by BigBand and 4.8 million shares sold by certain shareholders,
20
   including certain of the Individual Defendants, including the over-allotment), raising $148.8 million
21
   in net proceeds for the Company and the selling shareholders.
22
        44.     The IPO Registration Statement and IPO Prospectus were negligently prepared and,
23
   as a result, contained untrue statements of material facts or omitted to state other facts necessary to
24
   make the statements made not misleading and were not prepared in accordance with the rules and
25
   regulations governing their preparation.
26
        45.     The IPO Registration Statement and IPO Prospectus represented the following about
27
   BigBand's business and operations:
28

1

2

3

4

5

Our software and hardware product applications are used by leading service providers worldwide to offer video, voice and data services to tens of millions of subscribers, 24 hours a day, seven days a week. We have sold our product applications to more than 100 customers globally, including Cablevision, Charter, Comcast, Cox, Time Warner Cable and Verizon, which are six of the ten largest service providers in the United States. Our net revenues increased 80.3% to $176.6 million for the year ended December 31, 2006 from $98.0 million in 2005. We have been profitable on a quarterly basis since the three months ended September 30, 2006, and we first achieved profitability on an annual basis in 2006.

6

\*      \*      \*

7

8

9

10

Our expertise in emerging technologies, such as switched broadcast, and our customer relationships with large service providers are key strengths that enable us to gain greater insight into the network requirements of our customers. Leveraging this expertise, we combine our fully programmable hardware and modular software architecture to deliver product applications designed to meet service provider needs for intelligent, high-bandwidth networks. Our products are interoperable with a broad range of content and services in various parts of a service provider's network.

11

\*      \*      \*

12

The BigBand Solution

13

14

15

16

We develop, market and sell network-based platforms that enable service providers to offer video, voice and data services across coaxial, fiber and copper networks. Our software and hardware product applications are used to offer video, voice and data services commercially to tens of millions of subscribers, 24 hours a day, seven days a week and have been successfully deployed by leading service providers worldwide including six of the ten largest service providers in the United States.

17

18

19

20

We combine rich media processing, modular software and high-speed switching and routing with carrier-class hardware configurations into product applications designed to address specific service provider needs. Our product applications enable service providers to deliver high-quality video, voice and data services and offer more effective video advertising. Our key product applications include Digital Simulcast, TelcoTV, Switched Broadcast, and High-Speed Data and Voice-over-IP.

21

Our solution offers the following key benefits:

22

23

24

25

26

27

28

- *Intelligent Bandwidth Management.*    Using our product applications, service providers can address their increasing bandwidth needs. For example, we offer what we believe to be the only switched broadcast application commercially deployed today. Our Switched Broadcast product application only transmits channels to subscribers when the subscribers in a service group are in the process of watching those channels, instead of broadcasting all channels to all subscribers all the time. This enables service providers to achieve up to 50% savings in bandwidth usage for digital subscribers, allowing service providers to offer additional services without altering the subscriber viewing experience. One of our customers that had used all of its available

bandwidth capacity for existing channel programming was able to use our Switched Broadcast product application to add new, higher revenue HDTV channels without dropping existing channels.

- *High-Quality Video Experience.* Our product applications allow service providers to minimize the likelihood of video quality errors by detecting potential video quality degradation in real-time and correcting such degradation before the video stream is delivered to subscribers. Our core suite of video processing software modules are designed to enhance the richness of the viewing experience by optimizing the delivery of video streams, while our program level redundancy functionality adds the switching capability to automatically provision an alternative video stream should the quality of the primary stream begin to degrade.

- *Enhanced Video Personalization.* Using our product applications, service providers interact with their subscribers down to the individual channel change and, as a result, can more accurately tailor programming packages to the interests of their subscribers. For example, our Switched Broadcast product application enables service providers to satisfy consumer demand for increasingly personalized content by expanding the number of channels that can be offered because selected channels are only delivered when the channel is requested by a subscriber in the service group. Using this application, one of our customers was able to offer additional channel packages tailored to demographic groups.

- *Ability to Deliver Relevant Video Advertising.* Our product applications allow service providers to insert advertising tailored to specific subscriber groups. For example, using our Digital Simulcast application, service providers can simultaneously insert different ads into multiple copies of the same program and forward them to specific geographic zones. This allows service providers to attract advertisers interested in reaching niche markets.

- *Optimize Return on Existing Infrastructure Investment. Our network-based product applications allow service providers to manage service quality from the network, rather than deploying costly personnel and equipment at the customer premises. Because our product applications are deployed at the network level, service providers can leverage their infrastructure investment across many subscribers and avoid the hardware and service costs associated with an upgrade of equipment in the homes of subscribers. For example, using our M-CMTS architecture, service providers will be able to quadruple the existing downstream capacity of our High-Speed Data product application without the need to replace CPE. The need for higher speeds is increasingly required for the delivery of video over the Internet.*

- *Platform Flexibility.* Our product applications feature a fully programmable hardware and modular software architecture. Our field-upgradable hardware is designed to meet service provider platform flexibility requirements and to minimize the need to replace existing hardware. For example, one customer initially purchased our equipment for basic media processing functionality and was subsequently able to further enhance this same hardware platform within a matter of hours to deliver our advanced Digital Simulcast product application simply by licensing an additional software application from us.

## Strategy

Our objective is to be the leading provider of network-based products that enable the delivery of high-bandwidth, high-quality video, voice and data services and more effective video advertising. Key elements of our strategy include the following:

- *Further Technology Leadership Position. Over the past eight years, we have developed differentiated media processing and video systems design expertise. We used our media processing expertise to deliver what we believe to be the only switched broadcast product commercially deployed today. We are also building upon our IP networking and media processing expertise to develop the first M-CMTS solution. We will continue leveraging our expertise to deliver products that focus on optimizing network infrastructure and enabling delivery of a high-quality user experience.*

- *Leverage Modular Architecture to Accelerate New Product Introduction.* We have created a series of media processing software modules that, when combined with our programmable hardware and switching fabric, serve as the foundation for a range of network-based product applications. The competition between cable operators and telephone companies is accelerating the rate of change in their networks, and we believe our software modules will serve as the foundation for rapidly delivering solutions that address our customers' bandwidth and service delivery needs.

- *Expand Footprint Within Existing Customer Base. We are intensely customer focused. We have customer relationships with a number of service providers both in the United States and internationally, including six of the ten largest service providers in the United States. We believe these customer relationships give us a strong advantage in understanding our customers' network challenges and delivering timely solutions, as we did with our Switched Broadcast product application. We will continue to work closely with our customers on the designs of their network architectures and emerging services, expand our relationships with these customers to deploy more of our existing applications, and develop and deliver new applications to address their network challenges.*

- *Expand Customer Base Regardless of Access Technology. Service providers deploy video, voice and data services to subscribers across networks based on coaxial, fiber and copper. We have successfully deployed our product applications across these access technologies. We are currently providing Verizon with a solution that allows both digital and analog transmission of video over fiber-optic lines. Other telephone companies deploying video services over existing DSL lines leverage our media processing expertise to provide such video services. Still others use our product applications to carry services over coaxial cable. We intend to leverage our media processing expertise to penetrate new customers worldwide, regardless of the type of access networks they use.*

- *Broaden Addressable Advertising Capabilities.* We currently enable service providers to insert video advertisements targeted to subscribers in specific geographic zones. We intend to collaborate with our customers to continue developing and deploying next-generation advertising solutions and are currently in field trials with a leading cable operator for the delivery of ads tailored down to the individual subscriber level.

- *Leverage Video Over IP Expertise.* We believe that service providers will seek to offer live and on-demand video services to an increasing array of IP-capable devices, such as TVs, personal computers, mobile phones and portable devices, as well as attempt to integrate video, VoIP and data into new services. This will create a need for platforms that integrate video processing and IP networking. Since inception, our development efforts have focused on combining networking with real-time processing of video. *Our M-CMTS architecture is the first step in our plan to meet the market demand for video over IP by enabling cable operators to more cost effectively offer bandwidth to IP-enabled devices. We intend to further leverage our video expertise to provide a broader array of solutions to cable operators as they scale their video-enhanced triple-play services directed at PCs and other IP-capable devices.*

\*      \*      \*

*Switched Broadcast.* We believe we were the first company to develop and commercially deploy a switched broadcast application. Traditionally, service providers broadcast all channels to all subscribers at all times. Our Switched Broadcast application enables service providers to transmit video channels to subscribers only when the subscribers in a smaller subset of subscribers within a network, called a service group, are in the process of watching those channels. Depending on the number of subscribers and the amount of duplicate channels within a service group, our Switched Broadcast product application typically allows service providers to achieve up to 50% bandwidth savings in the delivery of digital video content and use the reclaimed bandwidth to offer additional content. This reclaimed bandwidth can be used to deliver niche video packages, more HDTV channels, high-speed data service and/or voice service. Service providers often use our Switched

1  Broadcast product application as a means to free up the bandwidth to implement digital simulcast.... In addition, our Switched Broadcast product application gives
2  our service providers real-time access to the actual viewing habits of their subscriber groups, information that is increasingly valuable as they and their advertisers seek to
3  tailor advertising or personalized channel services to specific subscriber groups and individual subscribers.

5  We deliver our Switched Broadcast product application by combining our core media processing modules with our BMR, Switched Broadcast Session Server and Broadband Multimedia-Service Edge hardware platform, which we refer to as
6  our BME.

7  *Data*

8  *High-Speed Data and Voice-over-IP.* Our High-Speed Data product application enables cable operators to offer real-time services, such as VoIP and
9  streaming video content over the Internet. Using our High-Speed Data product application, cable operators can offer different levels of data speeds, which can be
10 tiered based on the level of subscriber fees or on real-time bandwidth needs. Our High-Speed Data product application offers redundancy characteristics and a
11 distributed switch fabric with routing and forwarding capabilities across multiple application modules, instead of in a central core where switching latency can be
12 exacerbated. As a result, those cable operators that are deploying voice services can leverage the ability of our High-Speed Data product application to reduce dropped
13 packets and latency to deliver high-quality and reliable voice services.

14 *Modular CMTS is the next generation of our High-Speed Data product application, which is currently in multiple customer trials on three continents.*
15 *Customers using our existing CMTS product will be able to cost-effectively upgrade to our M-CMTS platform. This will allow them to quadruple their*
16 *downstream delivery capacity without additional CMTS equipment or next-generation cable modems. We accomplish this by combining a software upgrade*
17 *with an external edge quadrature amplitude modulation, or QAM, modulator for downstream traffic, freeing up processing capacity in our CMTS to process more*
18 *downstream traffic on the same hardware. We expect to begin commercial deployment of our M-CMTS product in the first half of 2007.*
19

20 46.     Both the IPO Registration Statement and IPO Prospectus were prepared and filed

21 during 1Q 2007. Nonetheless, neither the IPO Registration Statement nor the IPO Prospectus

22 disclosed that BigBand was having difficulty integrating and customizing its SDV technology, that

23 BigBand's past results were not indicative of its future operations and that the viability of the

24 Company's CMTS business was in doubt, which would adversely affect its 2Q and 3Q 2007 results.

25 47.     On August 2, 2007, BigBand issued a press release announcing its 2Q 2007 results,

26 stating in part:

27 BigBand Networks, Inc., a leading provider of broadband multimedia infrastructure for video, voice and data, today announced financial results for the
28 three and six months ended June 30, 2007.

1   For the second quarter of 2007, BigBand Networks reported net revenues of
$54.5 million, an increase of 43% over the second quarter of 2006. GAAP net
2   income for the quarter was $1.7 million, or $0.02 per diluted share, compared to a net
loss of $0.6 million, or ($0.05) per share reported in the second quarter of 2006.
3   Gross margin improved to 53.4% on a GAAP basis from a gross margin of 48.7% in
the second quarter of 2006. Operating income increased to $42,000 on a GAAP basis
4   during the second quarter of 2007 from an operating loss of $0.4 million in the
second quarter of 2006. GAAP results for the second quarter of 2007 includes $2.9
5   million in stock-based compensation expense and $0.1 million in amortization of
intangibles. In the second quarter of 2006, we incurred $0.5 million in stock-based
6   compensation expense, $0.1 million in amortization of intangibles and $57,000 in
preferred stock warrant expense. A reconciliation of our GAAP and non-GAAP
7   results is included as part of this release.

8   Excluding the above-mentioned charges, net of tax, non-GAAP results for the
second quarter of 2007 includes net income of $4.7 million, or $0.07 per diluted
9   share, compared to a net loss of $22,000, or $0.00 per diluted share, reported in the
second quarter of 2006. Gross margin improved to 54.2% during the second quarter
10   of 2007 from 48.9% in the second quarter of 2006. Operating income increased to
$3.1 million during the second quarter of 2007 from $0.3 million in the second
11   quarter of 2006.

12   "We are pleased with our improvements in both revenues and earnings results
in the second quarter," commented Amir Bassan-Eskenazi, president and CEO of
13   BigBand Networks. "We continued to drive significant expansion of the footprint of
our media services platforms. We continue to work closely with customers in
14   supporting their efforts to enhance their existing networks for advanced video
services. We believe that BigBand's solutions for switched broadcast and TelcoTV
15   will continue to gain traction with major customers both in the U.S. and
internationally.
16

17   For the first six months of 2007, BigBand Networks reported net revenues of
$107.3 million, an increase of 52% over the first half of 2006. GAAP results for the
18   six months period of 2007 includes net income of $0.7 million, or $0.01 per diluted
share, compared to a net loss of $1.6 million, or ($0.15) per diluted share reported in
19   the six months period of 2006. Gross margin improved to 55.4% in the first half of
2007 from 49.8% in the first half of 2006. Operating income increased to $3.4
20   million during the first half of 2007 from an operating loss of $1.5 million in the
first half of 2006. GAAP net income for the first half of 2007 includes non-cash charges
21   of $5.0 million in preferred stock warrant expense, $5.4 million in stock-based
compensation expense, and $0.3 million in amortization of intangibles. This
22   compares to non-cash charges of $0.2 million in preferred stock warrant expense,
$0.8 million in stock-based compensation expense and $0.3 million in amortization
23   of intangibles for the first half of 2006.

24   Excluding the above-mentioned charges, net of tax, non-GAAP results
include net income for the first half of 2007 of $10.5 million, or $0.16 per diluted
25   share. This compares to a net loss of $0.7 million, or ($0.06) per diluted share,
reported in the first half of 2006. Gross margin improved to 56.1% during the first
26   half of 2007 from a gross margin of 50.0% in the first half of 2006. Operating
income increased to $9.0 million during the first half of 2007 from an operating loss
27   of $0.4 million in the first half of 2006.

28   "Video continues to be a major driver of capital expenditures in service
provider networks. We believe that our technology innovation and time-to-market

leadership are key competitive differentiators in our video and data markets. Our product roadmap calls for more innovation as the industry moves to addressable advertising and personalized video services. We continue to be well-positioned for additional growth over the long-term and are optimistic about our business," concluded Bassan-Eskenazi.

Business Outlook

Based on current expectations, management provided the following outlook for its business in the third quarter of 2007:

Quarter Ending September 30, 2007

- Net revenues are anticipated to be in the range of approximately $54 to $58 million.

- GAAP gross margins are anticipated to be in the range of 53% to 55%, which includes approximately $0.4 million in stock-based compensation.

- GAAP operating expenses are anticipated to be in the range of $30 to $31 million, which includes approximately $3.0 million in stock-based compensation and amortization of intangibles.

- Provision for income tax is anticipated to be in the range of approximately $0.5 to $0.6 million.

- Fully diluted weighted average shares are anticipated to be in the range of 71 to 72 million shares.

- This equates to GAAP earnings (loss) per share in the range of ($0.01) to $0.03, and a non-GAAP earnings per share in the range of $0.03 to $0.07.

Fiscal Year Ending December 31, 2007

- Net revenues are anticipated to be in the range of approximately $225 to $230 million.

- GAAP gross margins are anticipated to be in the range of 54% to 56%, which includes approximately $1.5 million in stock-based compensation.

- GAAP operating expenses are anticipated to be in the range of $116 to $121 million, which includes stock-based compensation of approximately $10.5 million and amortization of intangibles of $0.6 million.

- Provision for income tax is anticipated to be in the range of approximately $2.0 to $2.5 million.

- Fully diluted weighted average shares are anticipated to be in the range of 69 to 70 million shares.

- This equates to GAAP earnings per share in the range of $0.03 to $0.08, and a non-GAAP earnings per share in the range of $0.28 to $0.33.

48.    On this news, BigBand's stock price collapsed from $13.98 per share on August 2, 2007 to close at $10.10 per share on August 3, 2007 – a one day decline of $3.88 per share or 28%

49.    After the disappointing second quarter results, the market began to question the price and timing of the IPO. On September 9, 2007, *Globes [online]* interviewed Bassan-Eskenezi:

[*GLOBES*:]    Which brings us back to the IPO. Perhaps you really did float too soon, and the company wasn't mature enough yet for this?

[BASSAN-ESKENEZI:]    The flotation was part of the process of building the company. The networked video transmission field is likely to be even larger than it is today. It was important to our customers that we also continue to establish the company as a public one with $150 million in the bank. New video technology companies are now leading this field, and veterans like Cisco weren't able to hold on to this market. Juniper was the one that made the big break with the advent of Internet transmission over service supplier platforms; IBM was already there when the PC was the big issue, but Intel and Microsoft also entered. We believe that we have the ability to build a company on a scale that will make it the leader of the entire networked video transmission industry.

[*GLOBES*:]    Are you referring here to the scale of Juniper and Microsoft? You've got big ambitions.

[BASSAN-ESKENEZI:]    Not Microsoft or Intel, because this is not a consumer's market, but look at how Juniper built the networking field. I think that our solution is radically different from that of the other companies, in the same fashion as Juniper differed in its approach to the networks market to Cisco and 3Com.

[*GLOBES*:]    Perhaps the IPO price of $13 per share was too high.

[BASSAN-ESKENEZI:]    We set a price that we believed showed where the company stands. We believe that in terms of potential, the company represents the price that we set as a result of the feedback we received during the road show. Without commenting on the price today, or tomorrow, the company is in a growing market, and our market share justifies the share price. This is something that should be assessed over time.

50.    Then, on September 27, 2007, after the market closed, BigBand announced that its 3Q 2007 results would be substantially below what the market was expecting:

BigBand Networks, Inc., today revised its revenue outlook for the third quarter ending September 30, 2007. The Company now expects to report revenue for the third quarter in the range of $35 to $39 million, which is below the Company's previous guidance of $54 to $58 million.

1     The lower revenue outlook is due to several coincident factors. BigBand has
been deploying switched digital video across an expanding number of customers and
2 configurations. Some of these ongoing deployments have required more software
customization and integration than originally expected. This impacted the
3 Company's ability to recognize switched digital revenue for some deployments in the
third quarter. The Company also experienced slowdown in Telco-TV revenue, as its
4 major customer worked through some previously purchased inventory. Finally, the
Company experienced continued softness in its data business. As a result of lower
5 revenue expectations, BigBand expects to report an operating loss for the third
quarter of fiscal year 2007.

6

7     "While we believe the market for our video solutions continues to be strong
and are confident in our roadmap for the long term, we are clearly disappointed in
our execution this quarter," said Amir Bassan-Eskenazi, BigBand's chief executive
8 officer. "We are aggressively addressing these issues and will provide more specifics
in our announcement of third quarter financial results in early November."

9

   51. On this news, BigBand's stock price collapsed to $6.40 per share on September 28,

10

2007 – a one day decline of over 29% on extremely high volume.

11

   52. The true facts which were omitted from the Registration Statement were as follows:

12

   (a) Due to difficulties in integrating and customizing its SDV technology,

13

BigBand would have to defer the recognition of revenue associated with its SDV product sales over

14

a longer period of time;

15

   (b) Customers were having interoperability issues with BigBand's SDV

16

technology due to integration problems with the software when used in connection with the

17

Motorola platform;

18

   (c) The Company's past results were not indicative of its future operations,

19

including revenue derived from its TelcoTV product sales, as large customers such as Verizon had

20

accumulated excessive amounts of inventory which would not be an ongoing occurrence; and

21

   (d) The viability of the Company's CMTS business was in doubt due to the

22

Company's inability to compete against the dominant players in the market – Arris, Cisco Systems

23

and Motorola. The Company's main competitors were larger, more established, better capitalized

24

and offered full end-to end solutions, which enabled to them to engaged in aggressive pricing to the

25

detriment of BigBand.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT I

Violations of Section 11 of the 1933 Act
Against All Defendants

53.     Plaintiff repeats and realleges each and every allegation contained above.

54.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

55.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

56.     BigBand is the registrant for the IPO. The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

57.     As issuer of the shares, BigBand is strictly liable to plaintiff and the Class for the misstatements and omissions.

58.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

59.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

60.     Plaintiff acquired BigBand shares pursuant and/or traceable to the Registration Statement for the IPO.

61.     Plaintiff and the Class have sustained damages. The value of BigBand common stock has declined substantially subsequent to and due to defendants' violations.

62.     At the time of their purchases of BigBand shares, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to September 27, 2007. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three

1  years elapsed between the time that the securities upon which this Count is brought were offered to

2  the public and the time plaintiff filed this complaint.

3                                    COUNT II

4                      Violations of Section 15 of the 1933 Act
                          Against the Individual Defendants

5

6        63.    Plaintiff repeats and realleges each and every allegation contained above.

7        64.    This Count is brought pursuant to §15 of the 1933 Act against the Individual

8  Defendants.

9        65.    Each of the Individual Defendants was a control person of BigBand by virtue of his

10 position as a director and/or senior officer of BigBand. The Individual Defendants each had a series

11 of direct and/or indirect business and/or personal relationships with other directors and/or officers

12 and/or major shareholders of BigBand.

13       66.    Each of the Individual Defendants was a culpable participant in the violations of §11

14 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of

15 the Registration Statement and having otherwise participated in the process which allowed the IPO

16 to be successfully completed.

17                               PRAYER FOR RELIEF

18       WHEREFORE, plaintiff prays for relief and judgment, as follows:

19       A.     Determining that this action is a proper class action and certifying plaintiff as a Class

20 representative under Rule 23 of the Federal Rules of Civil Procedure;

21       B.     Awarding compensatory damages in favor of plaintiff and the other Class members

22 against all defendants, jointly and severally, for all damages sustained as a result of defendants'

23 wrongdoing, in an amount to be proven at trial, including interest thereon;

24       C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

25 action, including counsel fees and expert fees;

26       D.     Awarding rescission or a rescissory measure of damages; and

27       E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

28

1

## JURY DEMAND

2    Plaintiff hereby demands a trial by jury

3    DATED: October 5, 2007

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
4    SHAWN A. WILLIAMS

5

6    _____
SHAWN A. WILLIAMS

7    100 Pine Street, 26th Floor
8    San Francisco, CA 94111
Telephone: 415/288-4545
9    415/288-4534 (fax)

10    COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
11    DARREN J. ROBBINS
DAVID C. WALTON
12    CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
13    San Diego, CA 92101
Telephone: 619/231-1058
14    619/231-7423 (fax)

15    Attorneys for Plaintiff

16    T:\usersSF\DeborahD\Cpt BigBand Networks.doc

17

18

19

20

21

22

23

24

25

26

27

28

1                    CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

2              Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3       named parties, there is no such interest to report.

4

5                                                    _____

6                                                    ATTORNEY OF RECORD FOR PLAINTIFF

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

ELLEN BRODSKY ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

Acquisitions:

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---------------|---------------------------|-----------------------------|
| 3/14/07 | 400 | $13.00 |
| | | |
| | | |

Sales:

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|-----------|-----------------------|-------------------------|
| | | |
| | | |
| | | |

5.     Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Brodsky v. Yahoo! Inc., et al.*, No. CV-07-03125-GPS(RCx) (C.D. Cal.)

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

BIGBAND

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __3__ day of __Oct.__, 2007.

_____
ELLEN BRODSKY

- 2 -